*IN THE*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

**FILED** LCW

EUGENE RHONEY
#A-15243 petitioner

AUG 1 9 2008
AUG 19 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

-VS-

No. 08 CV 4261

McCANN
Respondent

MAGISTRATE Kennlly

RESPONES TO COURT ORDER
FOR PERSONAL LETTER

TO: Honorable Magistrate Kennlly

Dear Judge this is the second time in almost 20 years; I have been Allowed, permitted to speak to Directly with out the translation of an Attorney. I MUST CONFESS THE FILLING Being At the END OF the Rope And the edge of AC/HF is present As I put forth my effort IN attempts Not to be Insulting or Disrespect or Annoying. So My FIRST Request IS FOR You to BARE with me.

Your Court ORDER LEFT ME A Little Puzled AS IN The Fashion should I speak my personal fillings FOR The reason I FILL You should Allow my writ Petition IN AND GRANT RELIEF WHICH I FILL IS SO Required.

To be SAFE I WOULD LIKE TO POINT OUT FACTS to A real possivbility of constitutional error, Mixed with reasonable Personality that A MAJORITY OF CIVILIZE People would All Agree equally the SAME.

Judge from your examination of my Petition And Authentic EXHITBITS MY YEARS OF STRUGGLING AS well AS my lack of expertise of Legal LAW, DeFiNes AN INFANT IN A ARENA with AN Army of Gladiators, Which with ONE ARm Knowledgable person on my TEAM "SIDE" That Knows only inches of the LAW should be enough AND ABLE TO HELP me Regain Freedom -

Enclosed ARE documents TO SHED LIGHT ON me being 80/0 NO Reasonable level of Representation

IMPORTANT FUNCTIONS served by the return hAs A very high Percentage to FAll short. Indeed by NO means Petitioner wANt Honorable Magistrate to refer its opinion to statue limiting review provided by FederAL HeAbeAs Courts, OR LAw to FACTS IN Question.

ALL issues At hand elaborates with UNITED STATES CONSTITUTION. Such statue limiting Review can be relaxed Applies to FACTuAL determination MADE BY STATE COURTS

-2-

Judge Also enclosed Are CONSISTANCE MOTIONS ALLOWED TO WITHDRAW AND GRANTING FINLEY MOTIONS AS A STATE NORMAL PROCEDURE, Which No Doubt makes issues defaulted by not being Raised. This routine that has taken Place in the First District of ILLINOIS APPELLATE Defender Office each time I WAS Appointed AN counselor out their office Filed FINLEY MOTIONS AND MOTIONS TO WITHDRAW WITHIN A Few MONTHS OF CASE being Assigned to them.

Judge SADLY and ludious ridicous TRIAL COUNSEL gave A Statement After I FILED charges Complaint Against her to the Attorney Registration AND disciplinary Commission Page# 12 61-62 Petition FoR POST-CONVICTION RELIEF: REASONS why she MADE NO Attempts to impeach STATE ONLY EYEWITNESS AFTER He change his STORY TESTIMONY MORE than ONCE: ALSO because EYEWITNESS NEVER SAID He witness Me Kill victim, When His complete Testimony WAS About witnessing my violence conduct AGAINST VICTIM WHICH EXPERT TOLD JURY It WAS the CAUSE of VICTIM Death the Action that witness described he witnessed.

EVERY detail described by A.S.A. Alledged confession she recieved from ME AND EYE WITNESS TESTIMONY WAS THE SAME I dentical, But EXPERT FACT FINDING ON DATE OF Death, Postmoren Report, Death Certificate

Contradicted ALL WITNESSES TESTIMONY EXCEPT ONE (1) Person whom got impeached. Yet the JURY NEVER heard the ~~death~~ DATE OF DEATH WHICH MEANS ALL WITNESSES Lied OR Expert M.D. WAS A Imposter.

Honorable Magistrate Its clear my fillings AND FACTS I POINTS OUT THAT supported by TRIAL Records OR AND Authentic documents Clearly Defines Ineffectiveness of Counselor DNA match. My 6th Admenment Right by the State has been USED AS A YARD STICK only given me inches, Not one reasonable level of Representation. EACH petition I Filed As listed in Appellate Counselor on Appeal MOTION TO WITHDRAW AND FINKEY MOTION. COULD AND ~~Right~~ Should have been Amended to guarantee my Right to At least ONE (1) Single opprtunity on Appeal.

Judge No lawyer Attempted to check with A gramma school for A child Attendance whom I picked up from school And showed identification, which would have gotten my illegal detention And False Arrest To have MURDER Charges And confession VOID and Arrest And STATEMENT Quashed. If ANY investigation from ANY Lawyer before TRIAL OR After TRIAL WAS Attempted so much evidence would have dropped upon then to Grant my release, HON JUST ONE LOOK AT DEATH Certificate OR Police Reports. Just one glance

-4-

AT POLICE RECORDS AND PRESENTED TO THE JURY OR
ON APPEAL Petition Admended for Trial Court to
Review Police Reports for witnesses statements which
could have helped me and proven A Chief-en-CASE OF A
violation of Due-prosess from STATEMENTS Given
from People that DID not show up AT TrIAL AND
Deffinitly would have made A difference in the out-
COME of MY TRIAL

Hon, Judge It is CRYSTAL Clear with OUT
NO EXPLANNATION or Theory; TO THE REASON
WHY A.S.A. Decided to bring MURDER Charges Against
ME A STRANGER AMONG ALL SUSPECTS that shared
the same Chicago housing Projets, MOST OF ALL
The two Brothers that confessed to involuement It
A Bloody Fight with Victim. It's Rare A brother would
Testify ON A nother Brother/Family OR Against their
Nehbors for majority of their lives.

Accordbevly to Police Records MedicAL examinations
STATE PROSECUTORS Knew... SUCH Documents Defives
subordated perjury from each testimony that prosecutor
never MADE A Attempt to correct such lies before the
Jury.

The Frustration of how A Rule or LAW is here today AND GONE TOMMORROW; Plus the Added Agravation trying to get ANY Appointed lawyer to raise certain issues. These events Are much more difficult than getting Around or over any obstacle that ever been before me in my Life.

Notice Hon. Judge I would have been Filed my Writ of heabeas Corpus Petition on this Post-Conviction Petition That in this year I Believe April 30, 2008 the Illinois Supreme Court who decided FOR ME TO WAIT ON THER Decision to reverse my Post-conviction AND WAIT ON them to mandate my case back to the Appellate Court As the said; Which I still has not recieved nothing on this issue from the Illinois Appellate Court or Illinois Supreme Court on such MANDATE, Also It has not been A YEAR since the Illinois Supreme Court made A decision.

On Page # 12 line 60-62 In this enclosed Post-Conviction Petition, Clearly established ineffectiveness of TriaL Counselor. AFTER CONVICTION Became FINAL, I Am entitled to heabeas relief under Antiterrorism and Effective Death Penalty Act (AEDPA) Sense my Trial lawyer Actually did FAiled to Investigate AND to present Subtantial miltigating evidence

to the Trial Jury and sentencing Judge was
either contrary to or involved an unreasonable
Application of," that establish law.

MAGISTRATE if trial counselor just clearly
pointed out to the Court And Jury, That Expert

M.D. for Cook County. Medical examination Findings
that victim was murdered on a Different date
that Eyewitness gave Account to the Jury. Which
EXPERT CONTRADICTED EYE WITNESS ENTIRE COMPLETE
Testimony. Especially how witness detailed all the
Play by Play Action violence that cause victim death.
On the other hand Eyewitness gave Police statements
Accounts of his personal Involvement that the
Jury never heard, which was to STOP his Brother
from getting hurt more than he had by victim and
EYEWITNESS STATES IT WAS ONLY HIS BROTHER
AND VICTIM AND himself present. No one but the
three of them Actually Knows what happen, so sense
I would not guess or lie to Police, A.S.A. or
Appellate counselor I am being penalize with
my Life Liberty And Freedom

JUDGE TRIAL COUNSELOR ADMITTS SHE never Attempted to impeach state eyewitness OR show No Attemp to impeach A.S.A. Confession Alledgally given to her. Which All jurist would Agree STATES ATTORNEY KNEW before Petitioner Arrest illegal detention AND doing Jury TRIAL that All evidence WAS False and manufacture At the Police Station Accorddenly to the Police Reports.

Hon, Magistrate doing the testimony of A.S.A. About A confession, TriAL Judge himself had to STOP the A.S.A. the STATE PROSECUTOR and my Atterney with given A warning on how my Fifth Admenment Right is being invoked.

MAGISTRATE Kennelly I don't mean to come Across fake or phony, So there fore I'll Admitt I reArrAInged AND copied 90 percent of this letter of lengthy citAtion, desperation to help me point out DNA, FACTs of Almost 20yrs of BAttling.

Just As it is put either EXPERT for Cook County whom have gave hundreds of testimony At CRIMINAL trials ARE A IMPOSTER or TriAL counselor And STATE PROSECUTOR even trial Judge conceALed AND or intentionally Allowed Pequry FrAud testimony IN A Agreement out side the preuce of Jury And my self.

— 8 —

This Lie About I willingly CAME to the Police station in A Police Car, leaving my Car Abandon, And staying At this Police station willingly from MARCH 18th, 19th And 20th until A criminal statement was finally given against me, Which then I was supose to have given A Confession. 3 days willingly detention in A interogation Room is insulting to even A infant belief. Actually if Trial counselor investigated police Report or neihbors, she would have learn my trip to police station was not willingly And their was never No Confession or Just get A Gramma school Attendence Record which would have prove police motive And lies that no doubt by law should have Quansh my ARREST.

The (AEDPA) placed A new constraint on the power of A Federal hербeas Court to grant A state prisoner Application for A writ of hербeas Corpus with respect to claims Ajudicated on the merits in STATE COURT, limiting issuance of the writ to circumstances in which one or two condictions is satisfied; the state Court Adjudicated resulted in A decision that; was to clearly contrary established Federal law as determined by the United STATES SUPREME COURT or involved an unreasonable Application of clearly established federal Law as determined by the Supreme Court

— 9 —

It is so much Mystery, many questions such As
If the Jury heard Police Reports of just All eyewitness
different statements And his Attempt to conceal victim
MURDER, WITNESS PERSONAL involvement in A family fight
that resulted in A MURDER / WITNESS ADMITTED AFTER
he knocked VICTIM TO THE GROUND VICTIM Never got
up And witness left. OR JUST THE FACT he never
Reported victim crime, That he WAS Not Just A
innocent by stander.

    ALL Above do SORTA make Any rational civilize
person wonder And raise An eye puzzling uncertain
with out the reasonable doubt

    My conviction following Admission of voluntary
Confession should Not stand regardless of the
Alledged trustworthness. A STATE MUST es TABIISH
quilt by evidence Independly And freely sec ured And
MAY NOT by coercion prove its charge Against An
Accused out of his own mouth," Such As the STATE
did in this case with A.S.A. And Arresting Police.
Which Police Reports still show crystal clear perjury
False manufactured statements

    Illinois Cook County Internal Affairs had to
Investigate And change statements that was given
before Petitioner Arrest. But change After his Arrest

-10-

because the brutality brought about untrue testimony
by the prime suspect. The Police behavior conduct
was so over bearing this suspect helped A.S.A. bring
MURDER charges against me, After my incarceration
his statements was changed by Cook County Chicago
Police Department internal Affairs. His changed
corrected statements left me/Petitioner free of
no involvement of victim death. Their never was
a hearing or review on the evidence outside this
one witness statement that was changed to see if the
STATE PROSECUTOR should still pursue my conviction on a
First degree MURDER charge.

    Sorry Magistrate Kennelly, But as I write I put
so much in it trying to give it all to you in what I
beleave is called A Nut-Shell, Im trying to tell you reasons +
point out facts why my Petition should be granted me some
heabea Corpus Relief. I began to feel ashame in my
desperate Attempt, Yet my thoughts And voice from
reviewing cases is making me Agressive with strenght
But not to cocky which is why this letter is so lenthy.

    STATE COURTs determination of Admissibility of confession As
voluntrary must be According to Constitutional standards
Satisfying due-process whether questions is left to jury or
determination determinable by trial Judge, MAGISTRATE
their is no mention of no challenge of my confession,
Surly I was denied such Due-Process

— 11 —

I WAS unconstitutionally tried And convicted WAS ritiated by error of constitutional dimension to extent that evidence of confession WAS Admitted upon test of voluntariness that departed from constitutional requirements. Jury never heard, I Refuesed to talk to A.S.A. period, Not one word to her. Yet A false statement identically AS STATE EYE WITNESS, Just merely to give Credibility to the STATE drug user Testimony.

Magistrate Kennelly I just learned that I should have had AN opportunity to have All issues which MAY be determinative of my guilt tried by A STATE COURT JUDGE or STATE JURY under Appropriate procedures which conform to requirements of Fourteenth Amendment.

Basically I AM Not entitled to A reasonable level of counsel on Post-conviction,"Wheather I CAN Not File ineffective ness on the lower Court lawyer on A Post, Yet each And every time I APPEAL my case Asigned to the same office which MOTIONED TO WITHDRAW each time And File A Finley MOTION less than 3 month or so having my case Asigned to A particular lawyer. It has become A NORMAL procedure to Allow STATE Appellate Defender office to sit on A case over A year before it is put before A Judge And Than the STATE Judge Allow them to withdraw in A few month s

-12-

Its only fair to say such time elaspe is Accounted to such delays And proceedure defrault will handkap merit issues.

I have desperately trying to get thur this webB that is placed Normally on all my Appeals wherefore being desperate I never gave up or gave in or gave out. In Hopes to get that one lawyer counselor that the UNITED STATES SUPREME COURT States; I'm Guranteed on Any Appeal. The thought of one Attorney Amending my Petition raising issues that should be reviewed. Will mean to me, That I dont have to relinguish the rest of my life in prison from Such injustice. All over A Drug Aditt being Allowed to save his own skin; He would have put his mother here to save himslef.

This is No Doubt A lenthy letter some repeated Perhaps difficult to Read, Lack of education. I have showed this letter and your ORDER to A few guys each one of them offered to Assit me for A fee, each one of them spoke of A different way to respond.

Date: July 11th/08    Thank You For Being Patient And Your Cooperation, Understanding

(s/ Eugene Rhoiney) A-15343
EUGENE Rhoiney
P.O.Box 112
Joliet Illi 60434

-13-

IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT - CRIMINAL DIVISION

EUGENE RHOINEY                    )
                                  )
        Petitioner,               )
                                  )        Case No.
vs.                               )
                                  )
PEOPLE OF THE STAE OF ILLINOIS    )
                                  )
        Respondent.               )
                                  )

## PETITION FOR POST-CONVICTION RELIEF

Now comes the Defendant-Petitioner, Eugene Rhoiney (hereafter, petitioner), pursuant to the Illinois Post-Conviction Act, Ill.Rev.Stat., Ch.38, par. 122-1 et seq., and moves this Honorable Chief Court to vacate the judgment entered on September 26, 1989, in the Circuit Court of Cook County, on the finding of guilty of murder in connection with indictment number 88-6091, and grant him a new trial and substitution of judge (see, attached motion).

In support thereof the petitioner states as follows:

1. On October 19, 1989 petitioner was sentenced by Judge James M. Schreier following a jury trial, for the offense of first degree murder, and sentenced to naturall life in prison without opportunity for parole indictment no. 88-6091 (mittimus papers marked as Ex. 1A).

2. On October 19, 1989 petitioner's Attorney Shelby Keisman filed for a new trial, which was denied, and then filed for notice of appeal.

3. Petitioner is presently incarcerated at Stateville Correctional Center, Joliet, Illinois, under register no. A-15243.

4. On May 2, 1990 petitioner filed a Motion for New Trial, under 2-1401 of the Civil Practice Act. It was denied. Petitioner appeal the denial, but the appeal papers were sent back to petitioner.

1.

5. On July 17, 1990 petitioner filed a Motion for Appointment of Counsel Other than the Cook County Public Defender, which was granted.

6. On appeal, petitioner was represented by appointed counsel, Barara Kamm of the State Appellate Defender. Petitioner's conviction was affirmed June 28, 1993. Petitioner then petition for a rehearing which was denied July 19, 1993.

7. Petitioner's (pro-se) Supplemental Petition for Rehearing under Plain Error was denied August 2, 1993 (case no. 89-2891).

8. Petitioner filed for leave to appeal to the Illinois Supreme Court and was permitted to proceed as a poor person on October 22, 1993 (case no. 76315), and was denied February 2, 1994.

9. Petitioner filed for Emergency Petition for Writ of Habeas Corpus, in Will County, on October 4, 1993, and was dismissed January 27, 1994.

10. In this petition, petitioner seeks a new trial, based on the ineffective assistance of counsel at trial, and on appeal (Discussed further infra).

11. In-effective assistance of trial counsel is alleged in the first instance herein, based on the failure of trial counsel to investigate and present available witnesses to support defendant's Motion to Suppress Statement and Quash Arrest and Suppress Evidence (Tr. 38,line 11 & pg. 39 line 1)(see Ex. D4).

12. Furthermore, due to counsel's deficient performance the hearing on said Motion was seriously inadequate, thus a violation of petitioner's Fourth Amendment right not to be held without probable cause.

13. For consideration of the fourth amendment petitioner was arrested on March 18, 1988, at about 3:   p.m., by Det. Harris and Det. Delponte, where the aforemention dettectives denied petitioner the right to call his attorney

2.

and demanded that petition accompany them to the police station.

14.  Petitioner, Sharon Sullivan and Sharon's Daughter was transported
to area four police station by Det. Harris and DelPont.  Upon arriving at the
police station petitioner was once again denied his right to communication with
his attorney.  (The facts herein were not develop due to counsel's deficience)

15.  Plaintiff was locked inside a small room along for about two (2) hours,
before Det. Harris entered the room, inquired about the murder of Stephen Ed-
wards, and a conversation with Ray Robinson about what occurred on January 23,
1988.  (This information is given under the penalty for perjury)

16.  Det. Harris ask petitioner if he wanted to tell his side of the
story, as to what happen on January 23, 1988.

17.  Petitioner told his side of the story, while Det. Harris took notes.
After petitioner had finished, Det. Harris simply got up and left the romm with-
out allowing petitioner to read or sign the statement, stating, that petitioner
concurred with all matters said on the document.

18.  In addition, counsel's failural to call petitioner to testify, plus,
the ommission of the testimony of Sharon Sullivan and Janice Pierce was pre-
judicial error and operated to allow the state to cover up the fact that peti-
tioner's fourth, fifth and sixth amendments rights was violated March 18, 1988,
and March 19, 1988.

19.  On March 19, 1988, the following morning, Det, DelPont open the
door and told petitioner that the State Attorney Delsene Thompson wanted to talk
to petitioner.  Petitioner told Det. DelPont. that he had not been given any thing
to eat, since petitioner were brought to the police station.  Petitioner was
simply told he would be given a meal later.

20.  Petitioner was taken to a large room where Det. Harris and Thompson
were waiting.  Assistant State Thompson told petitioner that she wanted to ques-
tion him about a murder.

21. Petitioner requested (as he had many times since his incarceration) for the opportunity to contact his counsel, petitioner was denied contact with his lawyer.

22. Assistant State Attorney Thompson told petitioner, "are you suee you don't want to talk to me? Ms. Thompson told petitioner, "I can help you. I'm the one who decides who gets charged or not. Now, are you still sure you don't want to talk to me?" Petitioner said, yes, I have nothing else to say until I see my lawyer."

23. Assistant State Attorney Thompson then told Det. Harris to take petitioner out of the room. At this time, petitioner was allowed to call his lawyer, Debra Gubin.

24. Petitioner informed his lawyer what had happen, and Gubin asked to speak to Harris. Thereafter, petitioner, was read his Miranda Rights and booked and locked up.

25. After about　　minutes or there about Ms. Thompson, Det. Harris and Det. PelPonte came to my cell and informed me that this was my last chance to give Assistant State Attorney Thompson a statement before she leave, plus, I knew the consequence of a refusal.

26. Petitioner told Ms. Thompson that he had nothing to say, so, the three of them left.

27. The standard for valid arrest and detention is "probable cause" which has been defined as sufficient facts and circumstances to lead a prudent man to believe that the suspect was committing or had committed a crime, and which constitutes more than a bare suspicion.

28. Once petitioner was in custody, the justification for dispensing

4.

with a neutral party's judgment evaporated and the Fourth Amendment required a prompt judicial determination of probable cause to justify extended restraint of petitioner, thus while a brief detention to complete the booking process, and other paperwork, before presenting an arrestee to the magistrate is allowed, any prolonged or extended detention for investigation is contrary to Fourth Amendment. U.S.C.A. Cont. Amend. 4.

29. Petitioner was kept over twenty-four (24) hours for the sole purpose of investigation in violation of the Constitution. Counsel's failural to protect petitioner's rights was prejudicial error.

30. Furthermore, a review of the police report dated March 20, 1988, see page 3, this report will show that only petitioner and Sharon Sullivan was taken to the station. Which happen to be in direct contradiction of the offices trial testimony. (see, attached Ex.02, and all other transcripts of the offices'contrdictory testimony.) Counsel's failure to mention that fact during the hearing was clearly ineffective assistance of counsel.

31. Counsel's failure to investigate and interview Sharon Sullivan and Janice Pierce regarding what happen on March 18, 1988, after being told by Attorney Green and petitioner, that Detective Harris Testimony totally contradicted the police report.

32. In considering, the importance of Sullivan and Pierce testimony, a review of the whole records will show this to be prejudicial error.

33. Moreover, petitioner was told by Sharon Sullivan, on a visit at the county jail, that she would not be able to testify for petitioner, because the detectives was dtermine to get petitioner, and Sullivan, said, 'the police had put his hands on her sexually, on two diferent occusions.'

5.

34. The second time it happen, she was with her daughter. She was told that if she testify something bad could happen to her, and she would lose her daughter because she was a dope user.

35. Petitioner asks the court to consider, what would have been the main purpose for Sullivan to testify, that is, was petitioner in the apartment when Sullivan arrived with Harris and DelPont.

36. Which would have proven that petitioner did not volunteer to go to the station. Petitioner seek appointment of counsel to find Sharon Sullivan and investigate his other claims of ineffective assistance of counsel.

37. Petitioner's due process rights were violated under 4, 6 and 14 amendments, where counsel's failure to interview and call Sharon Sullivan, Janice Pierce and Roosevelt Dyes to testify during the Motion to Suppress Statement and Quash Arrest and Suppress Evidence, after counsel had been informed of the facts concerning the contradictory statements by Attorney S. Green and Petitioner, that is, the testimony given by Det. Gene Harris on September 20, 1988, was <u>not true</u> and it conflect with the police reports (regarding, when and where Roosevelt Dyes gave his statements to the police)(see police reports 82)

38. On January 18, 1989, Det. David DelPont testified and stated primarily the same thing Det. Harris said, 'that it was only one conversation with Mr. Dyes, with an interruption, but the conversation was continued. And it was at the Police Station (Friday evening), on March 18, 1988.

39. Contrary to the above, the police report states there was two conversations, on two different days, March 18, 1988 (Friday evening between 8:00 and 12:00 p.m.), and March 19, 1988 (Saturday morning after 9:00a.m.).

40. Furthermore, it was also stated by both Harris and DelPont, that Harris wrote the report and DelPont type the report. "That should not have made

6.

a different, since Harris and DelPont were there during both conversations."
(Tr.78, 79 & 86)(Tr. 147-line 11)(Tr. 148-line 10)(See, Ex. 04..

   41.  There were no witnesses for the defense on the motion.

   42.  Petitioner's due process rights, and the right to a fair hearing
were denied, when the two Detectives was allowed by the court to commit perjury
and inconsistent testimony.

   43.  The motion was denied, due to the following opinion: (To. 241-242)

        Court finds from the totality of the circumstances and accepting
        the credibility of the officer that the defendant on March 18,
        1988, agreed to accompany the detectives to the station to
        straighten everythibg out and was not under arrest, just as he
        was not arrested on January 26th after being at area four..

        The court finds further that Rhoiney was arrested about 1:00 a.m.
        on March 19th after Roosevelt Dyes provided probable cause by Drell
        implicating Rhoiney in the homicide.  Thus the Motion to Quash and
        Suppress Evidece is denied.

   44.  The judge showed intentional judicial misconduct, where he improperly
denied the motions.

   45.  On September 20th,1989, Roosevelt Dyes testified and stated the
following: (To. 598 )

        Q:  Okay, now I want to take you back to the time that you talked
            to the police.

        A:  Go ahead.

        Q:  Okay, that was on March 18, and March 19th of 1988, is not that
            correct?  you talked to the police twice?

        A:  I'm not sure about the date?

        Q:  Well, they came to see you at your home?

        A:  Yeah, but we didn't have much conversation at my house.

        Q:  But the police came to see you at your home?

        A:  Yes.

        Q:  And the next day in March theyrecontacted you and brought you

                                7.

into the station?

A:  Right.

Q:  Okay, and that is when you had a further conversation with them?

A:  Right.

Q:  And that was with detective Harris?

A:  Yes.

46.  Counsel said she presented it to the judge, that is, Det. Harris and Det. DelPonte had committed perjury, regarding when they received Dyes two statements.  (When petitioner received his transcript, he notice there was no mention of the conversation, to the best of his knowledge)  Even if counsel had mentioned it to the judge, it was not brought to the attention of the jury, that the two detective committed perjury while testifying, based on those and other reasons petitioner seeks ineffective assistance of counsel.

47.  Petitioner's due process rights was violated under the 4, 5, and 14 Amendment of the United States Constitution, before and during the motion to Suppress Statement.

48.  Petitioner counsels' Sheldon Green and Shelby Keisman errored where they failed to bring up the notation in the police report is that petitioner refused to speak to Thompson, which is totally contradictory to the testimony given by Det. Harris and Det. DelPonte that petitioner gave a statement.  Based on the following reasons petitioner seeks ineffective assistance of counsel.

49.  Under direct examination Det. Harris were asked the following questions:

Q:  Did the defendant tell the assistant States Attorney that he wanted to talk to a lawyer?

A:  He gave a statement there, and then after that he told her

8.

> that he didn't want to talk any more and he wanted to talk
> to a lawyer.

Q: What happen after that period.

A: Well, he told her he didn't want to talk to her anymore and
he refused to she asked would he give a written statement
and he refused and he told her he wanted to talk to a lawyer.

(Tr. 50-1)(See, Ex. 6F)

    50.  Under direct examination Det. DelPonte was ask the following questions:

Q: After she told him that, what did the defendant do?

A: He indicated that he would talk about it. He was willing to
talk to the states attorney.

Q: Did he talk with the assistant State's Attorney?

A: Yes. He did.

Q: How long did he talk with the assistant states attorney for?

A: Fifteen or twenty minutes.

Q: What happened after he talked with the assistant states attorney
for about that length of time?

A: After that amont of time, he stated he did not want to talk any
more, and he wanted to contact his attorney.

(Tr. 127)

    51.  That was the extend of the questioning regarding whether or not pet-
itioner gave a statement to the state's attorney, and that was from State's At-
torney Susan Grussel.

    52.  Defense counsel made no mention of the notation during the motion or
trial, if that was trial strategy, it was not for the defense.

    53.  In the letter written to the attorney registration and disciplinary
commission counsel wrote the following:

> "Mr. Rhoiney indicates that I did not bring out the fact that he
> refused to talk to the assistant state's attorney upon his arrest

9.

In fact, Mr. Rhoiney had requested on attorney and that is why interrogation of him was terminated.  I felt it improper for me to comment on Mr. Rhoiney assertion of his fifth amendment right at trial, although, such comment was made at a hearing on Mr. Rhoiney's Motion to Suppress his statement."

(see, Ex.C3)

54.  In counsel's attempt to cover up her actions with the above explanation, which fall far short of a logical reason for the excuse  for not properly preparing for this important hearing.

55.  Counsel also said, such comment was made at a hearing on Mr. Rhoiney's Motion to Suppress his statement.  Yet, counsel made no attempt whatsoever, during the questioning of Assistant State's Attorney Thompson, the five pages of that cross examination by counsel.  (see, Ex.D4)

56.  In this petition, petitioner seeks ineffective assistance against appellate counsel for failing to present ineffective assistance against trial counsel, for failure to investigate and call witnesses, which the record shows would have contradicted the testimony given by Det. Harris and DelPonte during the motion to quash arrest.   (Tr. 598)(Ex.D4)

57.  The contradiction was proven during the trial when Roosevelt Dyes, testified that he did in fact give two statements one on March 18, 1988, at his home, and the second at area four on March 19, 1988.

58.  That testimony if given during the motion would have proven that petitioner was in fact arrested without probable cause.

59.  Petitioner's due process rights was violated under the 14 Amendment of the United States Constitution where counsel failed to impeach state's key witness Roosevelt Dyes, while giving testimony during trial, which were contrary to the police report.  But was in fact what Dyes had told counsel when she interviewed him at his home on Feb. 8, 1989 (See, Ex.C3), so there was no reason for

10.

for counsel not to have known that Dyes testimony was not what he had told the

police at area four on March 19, 1988, even if petitioner had not brought it to

counsel attention months before the trial and during trial.  Petitioner contends

ineffective assistance of counsel based on those reasons and the following:

A.-  When Dyes stated the first thing that happen, after the first argument was:

> "He told -- Edwards told Steve -- I mean Ray told Steven, he
> said, well, you wouldn't give me none of your's so I'm not go-
> ing to give you none of mine.  So that is when Steven picked
> up a stool and hit Ray with the stool."  (Tr. 579)(Ex.*DY*)

But during Dyes interview with Det. Harris on March 19, 1988 at the station (see,

Ex.*C*3).  It states:

> "Stephen and Ray were yelling at each other at this point, Eug-
> ene apparantly heard the commotion and came down stairs.  Eugene
> walked up to Stephen and hit him two or three time accross the
> knees with a piece of pipe."

Petitioner brought it to trial counsel attention during trial of the changes

Dyes made in his testimony.  That the bar stool incident happen after Steven

was hit across the knees, and not like Dyes had stated during trial.

B. -  Dyes was ask during trail by Ms. Ghaster: (*Tr. 581*)

> Q: And when he hit him on the leg with a pipe, where on the leg did
> he hit him?
>
> A: In the back of his leg.

The jurors were shown these pictures of the back of Stephen legs.  Which happen

to be exhibits # 58, 59, 60 and 61, after viewing those pictures the jurors would

have to assume, there was no way Stephen was capable of walking out of that base-

ment.  Trial counsel made no attempt to impeach Dyes for changing his statement.

Petitioner feels that if counsel had brought out the fact that Dyes statement

says, "Eugene the knew". Where as Doctor Teas testimony would have cleared the

11.

matter of Stephen being able to walk. (Tr. 698)

> Q: Doctor, in your opinion, could that bruising on the front of
> Steven Edwards knees have been caused by him falling to his knees?

> A: Yes, Sir.

There was only one picture regarding the front of Edwards knees, exhibit # 57.
After viewing the picture of exhibit 57 and keeping in mind what the doctor said,
if counsel would have brought it to the attention of the jury, that Stephen was
hit across the knees and not behind the knees. The jury would have had to as-
sume that Stephen was able to walk. Because just dropping to one knee might
cause a little pain, but it will not prevent you from walking or running, and it
did not for Stephen.

    60. Which is why the events were changed around in Dyes statement to
counsel, in order, to prevent Stephen from being able to leave out of the base-
ment, by Dyes saying Stephen was hit behind the knees.

    61. Petitioner contends this statement written to the attorney registration
and disciplinary commission might shade some light regarding why Dyes statement
was changed, and why Dyes testimony was not impeach. Counsel wrote:

> Mr. Rhoiney indicates that I failed to attack the credibility of
> a state witness, Mr. Roosevelt Dyes. However, Mr. Dyes testimony
> at trial was more favorable to Mr. Rhoiney than Mr. Dyes' state-
> ment to police. I was certain I would gain nothing by showing
> that his story changed. Mr. Dyes' never testified that he saw Mr.
> Rhoiney commit the murder. (See, Ex.C3)

    62. For counsel to have made that statement, one would have to assume she
was not paying attention to the testimony during trial. Due to the fact that
petitioner feels he was found guilty after Dyes said the following: (Tr. 584)

> Q: And what did Eugene do after that?

> A: And he started beating him with the pipe.

> THE COURT: Starting hitting who with the pipe?

12.

THE WITNESS:  Hitting Steve with the pipe.

Q:  And where did he hit Steve with the pipe?

A:  On the head.

Q:  And how many times did he hit Steve in the pipe -- hit on the head with the pipe?

A:  Twice, twice.

Q:  And how did it sound when he hit Steve in the head with the pipe?

A:  It sound like a blow, pretty loud blow.

Q:  What did Steve do after he was hit on the head with the pipe?

A:  He crawled out the hallway into the floor and he told Eugene that he was getting dizzy.  (Tr. 584,line-2)

63.  The following is testimony given by Doctor Shaku Teas, during the

trial: (Tr. 690-691

Q:  And Doctor, would these injuries to the head, these blows alone to the head, disregarding any other injury to the body that was sustained, would those injuries to the head have been sufficient to cause the death of Steven Edwards?

A:  Yes, they would.

Q:  Doctor, approximately -- assuming these injuries to the head were received first, approximately how long could Steven Edwards have walked around.

MS. KEISMAN:  Objection.

THE COURT:  Overruled.

THE WITNESS:  He could have been alive for a short while after that. Without -- he could have been a live for longer, but he would probably have lost consciousness after that. He would have been probably alive say minutes.  Maybe half an hour maybe forty-five minutes.

64.  There was numerous other changes made while Dyes was testifying, which

will also show that counsel was in fact ineffective during trial for not attack-

13.

ing the credibility of the states' key witness Roosevelt Dyes.

65.   Petitioner's due process rights were violated under the 14 amendment, when counsel allowed Carolyn Lewis, a witness, for the state to give testimony other than what Lewis statement was to the police.  Lewis had been interview by the police twice and she never related the following:

> Q: Before you left did Eugene Rhoiney say anything to you?
>
> A: Yeah.
>
> Q: What?
>
> A: He walked me to the door and I asked him to please keep Steven Edwards away form me because I never wanted to see him again.
>
> Q: And what did Eugene Rhoiney say to you?
>
> A: He said I wouldn't see him again.

(Tr. 553, line-3)(see, Ex.D 4).

66.   The police report will show that Lewis never said that to the police, but counsel made no attempt to impeach that testimony with the police report (see, Ex. 3B).  That testimony was very damaging to petitioner's defense.

67.   In counsel's letter to the attorney registration and (see, Ex.C3) disciplinary commission, counsel wrote the following:

> "Mr. Rhoiney indicates that I failed to impeach the testimony of Carolyn Lewis.  To the best of my recollection I did impeach the testimony of Ms. Lewis to the extent that her testimony was dam-aging."  (See, Ex.C3).

68.   When counsel implied that Lewis was impeached based on the knowledge that petitioner had of the law at that time, Lewis was not impeach.  Lewis test-ified on September 20, 1989, and impeachment took place on September 22, 1989 (see, Ex. 859, line-11), when Detective Gene Harris was call to give testimony regarding what Janice Pierce and Jackie Gaston had said and no one else.  So

14.

whatever Shields might have brought out during cross examination was not the same as impeaching Lewis. It might have left room for doubt, but that's not the same as impeaching the testimony.

69. The record will show that Keisman didnot cross examine Lewis, Shields did, but it was brought to Keisman attention at the table, during Lewis testimony right after the change, and no attempt was made to impeach Lewis. Petitioner contends ineffective assistance of counsel based on those reasons.

70. Petitioner's due process rights were violated under 6 and 14 amendment, when counsel's failed to interview Janice Pierce and Jackie Gaston before they testified. This mistake of counsel unprepareness lead to the defense witnesses impeachment. Even though, petitioner feels their mistakes were intentional, it was counsel's duty to prepare the witnesses to testify.

71. Furthermore, since counsel only had two witnesses for the defense, there was no reason for counsel not to have been able to have went over their testimony with them.

72. For the reason stated above and hereafter, petitioner feels counsel's
/his
actions lead to ineffective assistance of counsel and prejudiced    defense at trial. (Tr. 862-69)(see, Ex.D 4.)

73. Appellate counsel's failure to raise the issue of trial counsel's ineffectiveness during trial, while allowing state witnesses Roosevelt Dyes, Carolyn Lewis, Detective Gene Harris and David DelPonte to change their testimony while testifying. And trial counsel's failure to correct judge (Tr. 595, line 12) after judge had change the testimony of Dyes (Tr. 597, line-1) while counsel appear to be laying the ground work to impeach Dyes. (see, Ex.D 4).

74. Petitioner's Constitutional rights was violated under the 4, 6, and

15.

14 amendments, in the first instance herein based on the missing testimony of
Ray Robinson prejudice defendant's defense.

75.  Defendant further claims that Ray Robinson testimony was exculpatory
and vital to defendant's defense.  Counsel's failure to subpoena Ray Robinson
shows that counsel was in fact ineffective for defendant's defense.  Wherefore,
defendant contends ineffective assistance of counsel based on those reasons and
the following.

76.  In light of what trial counsel wrote to the attorney registration
and disciplinary commission clearly reflects the reason why Ray Robinson did
not receive his subpoena to testify.  (See, Ex. C 3)

77.  Counsel wrote: "Mr. Rhoiney indicates that I failed to call Mr. Ray
Robinson to testify at trial.  In fact, Mr. Robinson was a witness for the state.
Although they served him with a subpoena, he failed to comply and appear in
court.  Mr. Robinson had given a statement to the police that was extremely
damaging to Mr. Rhoiney.  We had nothing to gain by calling him as a witness in
our own case."

78.  That statement displayed that counsel was extremely incompetent or
working against defendant.  That is when you consider what the police report says
(see, Ex. B 2), and what Robinson told the investigator (see, Ex. C 3).  What Rob-
inson allegedly told the state attorney on March 19, 1988, on page 8 of the
police report was not true.

79.  Moreover, this was proven by the two investigators that took pictures
of the basement, that you could not see into the hall from the couch.  And you
would have to assume that the state would not subpoena Ray Robinson after he had
given a statement, saying he was beaten up by the police and his statement changed.

16.

80. And counsel was aware of these fact before trial. Due to counsel statement and considering what Robinson would have said shows ineffective assistance of counsel.

81. Petitioner's due process rights were violated under 14,amendment, when counsels' Green and Keisman failed to raise the issue of the medical death certificate during preliminary hearing or trial to determine the cause, date, and time of death for probable cause to be found.

82. The death certificate was extremely important for his defense, since the death certificate of Stephen Edwards showed a defferent date than the date petitioner was found guilty for.

83. It's obvious in light of these fact, that counsel's strategy was not for petitioner since counsel had in her possession the pathologist report which contained the death certificate. Counsels' actions can only be viewed as intentional negligence against petitioner defense.

84. Petitioner's due process rights were violated under 14 amendment, when the prosecutor and the court violated his constitutional rights by way of not presenting the Medical Death Certificate at preliminary hearing or the trial, as being authentic issued on Mr. Stephen Edwards to determine a probable cause of the victim's death, and to substantiate the cause of the victim's death.

85. The prosecutor and the court was in violation of the statues of Public Health, 5351 18(a)(b)(c)(2)(3)(4)(5).

86. Petitioner's due process rights were violated under 14 amendment, when the prosecutors engaged in intentional misconduct, before, during and after trial, when prosecutors withheld evidence from the court and jury. Which if had been presented to the court, would have provided enough evidence for the court to

17.

dismiss all charges against petitioner.  For example:

    (1)  Petitioner was arrested without probable cause, according to the police reports.

    (2)  Petitioner was indicted for a murder, whereas no death certificate was presented, before or during trial according to the records.

    (3)  Prosecutors allowed perjueied testimony to be interred into the records before and during trial by Detectives Gene Harris, David DelPonte, ASA Delsene Thompson, Roosevelt Dyes and Carolyn Lewis.

87.  Petitioner contends that due process requires that the prosecution interest in a criminal prosecution is not that it shall win a case, but that justice shall be done.

88.  In the case at bar, the prosecution failed in their duty by entering into a conspiracy to with hold the death certificate from the jury.  Building upon that obligation, the prosecutors must correct any material perjured testimony of its witnesses (see, __ , ___, ___, and ___ of this petition) where they know or should know from information that it has received that the testimony is false.

89.  Once again, the prosecutor failed short of its obligation to see that justice shall be done, when the prosecutor failed to ask the pathologist, when the victim died.  In Illinois expert medical testimony is unnecessary to prove the cause of death where the facts proved are such that laymen of average intelligence, based upon their knowledge or experience would understand the acts of defendant was  the cause.

90.  In the case at bar, expert medical testimony was needed, due to the fact that the decease had received multiple stab wounds and multiple blunt force injuries.  Which made the cause of death beyond the understanding of a laymen of average intelligence.  The pathologist gave testimony regarding all the wounds

the decease received, as well as how long the decease could have lived after
receiving the blows to the head, which was 30 to 45 minutes, but pathologist was
never ask when did the victim died.

91.  The was provided by the prosecutor (Tr. 229    ) and testimony from
Mr. Dyes during trial.  The blows to the head happen first, which, determines
the date and time of death, since the pathologist testified that the victim
could not live no longer then 30 to 45 minutes after receiving the blows to the
head.  Yet, the pathologist report which contained the death certificate contra-
dict the trial testimony of Dyes.  The pathologist report which contained the
death certificate give 1-24-88 as the time of death.  Hence, a major contra-
distinction.  Dyes testimony determined the date to be 1-23-88 and time of dea-
th before 11:30 a.m. (see, death certificate "pathologist report" first page)

92.  This document was too important not to use, because it support the
testimony of Jackie Gaston, that is, that the decedent was seen after 11:30 a.m..
Which shows that counsel's performance was deficient, and fell below the standards
of the sixth amendment.

93.  "In the enforcement of criminal law miscarriages of justice and de-
nial of due process occur more often than judges and prosecutors are willing to
admit. e.g.People v. Cihlar, 111 Ill. 2d 212, 95 Ill.Dec. 297 (1986); People v.
Corville 95 Ill.2d 497, 69 Ill.Dec. 945 (1983)."

94.  This cause should be remanded for a hearing to determine if the facts
established a prima facie case of discriminatory use of the challenges, and, if
so, to allow the prosecutor to provide a neutral explanation for his actions.
Reversal of the conviction would result if the prosecutor's use of his challenges
was demonstrated to be discriminatory.  In the instant case,

95.  In the instant case, Rhoiney's defense attorneys objected to the

State's peremptory challenges against blacks but the trial court refused to hold a hearing for the State to give race neutral reasons why it exercised its challenges against the bleak prospective jurors. A remand is necessary because a _prima_ _facie_ case by the defense had been established, requiring the State to explain its challenges.

96.  In People v. Harris, 129 Ill.2d 123, 544 N.E.2d 357 (1989), the court helded: "a court should not presume, or infer from the facts of the case, that a unarticulated neutral explanation exists.  (See Uniedo, 738 F.2d at 1430) Rather, a court must focus its inquiry on the reasons actually articulated by the State." 544 N.E.2d at 384.  In Harris, the Illinois Supreme Court remanded the case for a new Batason hearing because the trial court did not rule on the basis of race neutral reasons proffered by the State but erroneously concluded there was no discrimination on the basis of facts which the trial court discerned from the record.

97.  Subsequently, this Court in Harris 182 Ill.App. 3d 114, 537 N.E.2d 977, 979 (1st Dist., 1st Div., 1989) indicated that the determination of discriminatory use of peremptory challenges is based upon the "motives" of the prosecutor.  Thus, only the actual prosecutor's reason for excluding a juror is relevant.

98.  Finally, in People v. LeCurtis Johnson, 199 Ill.App.3d 798 (1st Dist., 1st Div., 1990) the Court overturned the trial court's determination of no _prima_ _facie_ case of discrimination in part on the basis of a memorandum drafted by a prosecutor who was not the original prosecutor at trial and without consultation with the original prosecutor.  In the memorandum, the second prosecutor quoted answers of excluded jurors and annotated her comments as to why the State exercised a challenged against this juror for race neutral reasons.

99.  This Court found that the second prosecutor's race neutral reasons were speculative and only the actual basis by the original prosecutor is determinative in deciding if the juror was excluded on the basis of a discriminatory act.  557 N.E.2d at 569.

100.  The same conclusion reached in Johnson and the other two cases is applicable here.  The trial court's speculation as to race neutral reasons for the exclusion for certain African-Americans was improper.

WHEREFORE, defendant prays for an evidentiary hearing on this petition, and for an order granting a new trial.

RESPECTFULLY SUBMITTED,

*Eugene Rhoiney*

EUGENE RHOINEY/Pro-se
Register number A-15243
Stateville Corr. Ctr.
P. O.  Box  112
Joliet, IL  60434

SUBCRIBED and SWORN to before
me this _15_ day of _June_ 1994

_____
NOTARY PUBLIC

"OFFICIAL SEAL"
GLENN CATLETT
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 1/29/97

21.

### AFFIDAVIT

    Plaintiff Eugene Rhoiney, being duly sworn on oath, states he is the pro se counsel in the above-entitled cause; that he personall drafted all of the attached foregoing; that he notes the contents thereof; and that he states they are all true to the best of his knowledge and belief.

*Eugene Rhoiney*

SUBSCRIBED and SWORN to before
me this *15* day of *March* 1994

NOTARY PUBLIC

*Glenn Catlett*

"OFFICIAL SEAL"
GLENN CATLETT
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 1/29/97

No. 1-05-2489

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| **PEOPLE OF THE STATE OF ILLINOIS,** | ) | Appeal from the Circuit Court |
| | ) | of Cook County, Illinois. |
| Respondent-Appellee, | ) | |
| | ) | |
| -vs- | ) | No. 88 CR 6091 (02). |
| | ) | |
| **EUGENE RHOINEY,** | ) | Honorable |
| | ) | James M. Schreier, |
| Petitioner-Appellant. | ) | Judge Presiding. |

## MOTION TO WITHDRAW AS COUNSEL ON APPEAL
## PURSUANT TO *PENNSYLVANIA V. FINLEY*

The Office of the State Appellate Defender, by Michael J. Pelletier, Deputy Defender, and Maria A. Harrigan, Assistant Appellate Defender, moves for leave to withdraw as counsel for Appellant, Eugene Rhoiney, in this cause.

In support of this motion Maria A. Harrigan, Assistant Appellate Defender, states:

1.      Petitioner-Appellant, Eugene Rhoiney was sentenced to natural life in prison for first degree murder on October 19, 1989. Appellant is currently incarcerated. His conviction and sentence were affirmed on direct appeal in appellate court number (1-89-2891). See *People v. Rhoiney*, 252 Ill. App. 3d 320 (1st Dist. 1993). Petition for Leave to Appeal (PLA) was denied on February 2, 1994.

2.      On May 2, 1990, Rhoiney filed a 2-1401 petition, which was denied on June 20,

1990.

3.      On October 4, 1993, Rhoiney filed a State Habeas petition.  It was denied on January 27, 1994.  The dismissal was affirmed on appeal and PLA was denied on October 6, 1994.

4.      On March 17, 1994, Rhoiney filed a petition for post-conviction relief.  It was dismissed on March 28, 1994.  Appellate counsel's motion to withdraw was allowed on December 27, 1994.  PLA was denied on April 5, 1995.

5.      On December 1, 1995, Rhoiney filed a second post-conviction petition.  It was dismissed on February 20, 1996.  Appellate counsel's motion to withdraw was allowed on August 4, 1997.  PLA was denied on December 3, 1997.

6.      On May 2, 1998, Rhoiney filed a third post-conviction petition.  It was dismissed on June 6, 1998.  Appellate counsel's motion to withdraw was allowed on December 30, 1999.  PLA was denied on July 5, 2000.

7.      On April 4, 2005, Petitioner-Appellant filed a fourth petition for post-conviction relief.  The petition was denied by the Circuit Court.

8.      Late notice of appeal was allowed.  The Office of the State Appellate Defender was appointed.

9.      After an examination of the record on appeal, and after discussing the case with another attorney in the office who also read the record on appeal, counsel has concluded that there are no issues of arguable merit to be raised on appeal.  Counsel has informed petitioner of this conclusion and that counsel intends to file the motion to withdraw.  Therefore, counsel hereby moves to withdraw as counsel on appeal pursuant to *Pennsylvania v. Finley*, 481 U.S. 551 (1987).  A memorandum supporting this motion is attached.

WHEREFORE, the Office of the State Appellate Defender respectfully moves to withdraw as counsel on appeal in this cause.


Respectfully submitted,

MICHAEL J. PELLETIER
Deputy Defender


MARIA A. HARRIGAN
Assistant Appellate Defender
Office of the State Appellate Defender
203 North LaSalle Street - 24th Floor
Chicago, Illinois 60601
(312) 814-5472

COUNSEL FOR PETITIONER-APPELLANT

No. 1-05-2489

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County, Illinois. |
| Respondent-Appellee, | ) | |
| | ) | |
| -vs- | ) | No. 88 CR 6091 (02). |
| | ) | |
| EUGENE RHOINEY, | ) | Honorable |
| | ) | James M. Schreier, |
| Petitioner-Appellant. | ) | Judge Presiding. |

## MEMORANDUM IN SUPPORT OF MOTION FOR LEAVE TO WITHDRAW AS COUNSEL ON APPEAL

### STATEMENT OF FACTS

Eugene Rhoiney and co-defendant Angelo Roberts were charged, *inter alia*, with the January 23, 1988 first-degree murder of Stephen Edwards.[1] (T.C. 27)[2] The following evidence was adduced at Rhoiney's jury trial.

At 9:45 a.m., on January 24, 1988, police discovered a dead body behind the Jewel Food Store at 3552 West Grand Ave., Chicago, IL. (R.R. 492) The body was wrapped in a green,

---

[1]Co-defendants were tried separately. Roberts was acquitted of the murder, but convicted of concealment of a homicidal death. Roberts is not a party to this appeal.

[2]Citations to the trial record will be T.C. (common-law), S.C. (supplemental common-law), and T.R. (report of proceedings). Citations to the post-conviction record will be C. (common-law) and R. (report of proceedings)

yellow, and white bed sheet and a portion of a blue and white bed sheet served as a blindfold. (R. 493) The next day, the body was identified as Stephen Edwards. (T.R. 515) On January 26, 1988, police went to the home where Edwards had rented a room, located at 3841 W. Adams, Chicago, IL. Rhoiney answered the door and told police that decedent had lived in the basement. (T.R. 517) Janet Pierce, the owner of the house, gave police permission to see Edwards's room. (T.R. 518) On a daybed just outside decedent's room, police noticed a green, yellow, and white-striped bed sheet underneath the cover blanket. (T.R. 520) There was also a blue and white fitted sheet on the bed. Police recovered the sheets as well as a roll of grey duct tape form a tool box. (T.R. 521)

Rhoiney agreed to go to the police station for questioning. (T.R. 527) He told police that on the night of January 22, 1988, a group of people watched the Tyson/Holmes fight on television at Pierce's home. (T.R. 529) Edwards and his girlfriend, Carol Lewis, were there. (T.R. 529, 541) Lewis accused Edwards of stealing her money and moving her car while she was asleep. (T.R. 546) Rhoiney overheard this argument. (T.R. 529-530) According to Lewis, prior to accusing Edwards, she heard Ray Robinson tell Edwards to steal her stuff. (T.R. 541) Lewis left the Pierce home at 7:00 a.m., but returned at 8:30 a.m., accusing Edwards of having stolen her VCR. (T.R. 530, 550) According to Lewis, when she left the second time, she asked Rhoiney to keep Edwards away from her because she never wanted to see him again. Rhoiney responded that she never would have to. (T.R. 552)

According to Rhoiney's statement, shortly after Lewis left, the telephone rang and the caller asked if there was "a white guy living in the building with you?" The man said someone had stolen his car and he suspected the tenant at the Pierce home. Rhoiney gave the telephone to

2

Edwards. (T.R. 531) After the conversation, Edwards got into a beige station wagon with two black men. Rhoiney told police that he never saw Edwards again. (T.R. 552)

Roosevelt Dyes, a/k/a Dave, testified that on January 22, 1988, he watched the fight at Pierce's home. (T.R. 576) On the morning of January 23, Dyes took Ray Robinson, Dyes's brother-in-law, to a currency exchange to cash a check and then they returned to the Pierce house at 8:15 a.m. (T.R. 576-577) Robinson and Dyes went to the basement. Robinson cooked some heroin or cocaine. (T.R. 578-579) Edwards went to the basement 10-15 minutes later and there was an argument about the drugs. (T.R. 579) Edwards hit Robinson with a stool. (T.R. 579) Rhoiney came downstairs and hit Edwards in the legs with a pipe. (T.R. 580-581) Rhoiney went upstairs and the fight between Robinson and Edwards continued. (T.R. 583) Rhoiney returned to the basement, separated Robinson and Edwards, and then proceeded to beat Edwards about the head with the pipe. (T.R. 583-584) Edwards said he was dizzy and his head was bloody. (T.R. 584-585) Rhoiney sent everyone upstairs, saying he would take Edwards to the hospital. (T.R. 585)

Anthony Dandridge testified that at about 10:00 p.m. on January 23, Rhoiney asked him to come to Pierce's house and help him clean the basement. (T.R. 605-606) Dandridge and Edy, one of Rhoiney's relatives, picked up bloody towels and put them in a garbage bag. (T.R. 607-608) They mopped blood off the floor and took the towels and some blood-stained floor wood to the back seat of the 1988 Buick Rhoiney had been driving. (T.R. 608-609) Rhoiney and Edy put a rolled-up carpet in the trunk of the car. (T.R. 610) Edy and Dandridge rode with Rhoiney to the alley behind the Jewel where they threw the garbage bag out of the car. (T.R. 611) Rhoiney gave Dandridge $2.00 to buy dog food. (T.R. 612) Dandridge left Edy and Rhoiney in the car

3

while he went in the store. When he returned, they drove him home. (T.R. 613)

Detective Harris spoke with Rhoiney on January 31 and March 18, 1988. During the

March 18 conversation, Rhoiney admitted hitting Edwards in the legs with a pipe after talking to

him about stealing from Lewis. Robinson and Dyes were there. (T.R. 636-637) Rhoiney said

when Edwards lunged at him, he hit Edwards in the head with the pipe and then walked upstairs.

(T.R. 637) Rhoiney heard some noise from the basement and returned to find Robinson and

Edwards fighting. (T.R. 638) Dyes left and Rhoiney and Robinson went upstairs. (T.R. 639-

640) Later, Edwards left to retrieve Lewis's VCR. (T.R. 641) Rhoiney said his prior statement

about Edwards leaving in a beige station wagon was a lie. (T.R. 642)

Dr. Shaku Teas testified that Edwards had sustained numerous blunt force injuries to the

head and neck, a stab wound in each lung, and bruises on the legs and hands. (T.R. 680-701)

The cause of death were the head injuries and stab wounds. (T.R. 702) Edwards's blood was

found on his mattress. The bed sheets from the Pierce home matched the bindings recovered

from Edwards's body. (T.R. 758-761)

Janet Pierce testified on behalf of Rhoiney that she saw Rhoiney at a party at 10:00 p.m.

on January 23, 1988. (T.R. 816) There were no bloody rags in the basement when she returned

home at 11:00 p.m. (T.R. 818) Jackie Gatson saw Edwards at a drug house on the evening of

January 23, 1988. (T.R. 833-834)

The jury found Rhoiney guilty of first-degree murder. (T.R. 955) He was sentenced to a

mandatory natural life term based on a prior murder conviction. (T.R. 1325; T.C. 259)

On direct appeal, Rhoiney argued that there was a Batson violation, new counsel should

have been appointed to argue his post-trial motion alleging trial counsel's ineffectiveness, the

4

II.

## LEGAL ANALYSIS

The Post-Conviction Hearing Act establishes a remedy for a criminal defendant who claims that a substantial violation of his federal or state constitutional rights occurred in the proceedings that resulted in his conviction. 725 ILCS 5/122-1 *et seq.* (1992); *People v. Edwards*, 197 Ill. 2d 239, 243-44 (2001). A post-conviction proceeding is a collateral attack on a prior judgment and the scope of post-conviction review is limited to constitutional matters that have not been and could not have been previously adjudicated. *People v. Thompkins*, 161 Ill. 2d 148, 157 (1994); *People v. Tate*, 305 Ill. App. 3d 607, 611 (1st Dist. 1999). A court may dismiss a *pro se* post-conviction petition within 90 days without appointing counsel only if the allegations in the petition, taken as true and liberally construed, fail to present the gist of a constitutional claim. 725 ILCS 5/122-2.1(a)(2); *People v. Boclair*, 202 Ill.2d 89, 99 (2002). The gist standard is a "low threshold" in which the petitioner is required to include "a limited amount of detail" in the petition and need not "make legal arguments or cite to legal authority." *People v. Gaultney*, 174 Ill.2d 410 (1996).

A trial court's dismissal of a petition at the pleadings stage, is subject to *de novo* review. *People v. Coleman*, 183 Ill.2d 366 (1998).

In the case at bar, any argument of improper dismissal based on procedural grounds would be non-meritorious. The circuit court properly considered the merit of the petition and summarily dismissed it within the requisite 90-day period. *See* 725 ILCS 5/122-2.1(a)(2) (West 2005). Rhoiney's petition was filed on April 4, 2005. (C. 12) The circuit court examined the

6

allegations of the petition and summarily dismissed it on May 6, 2005, 2004. (C. 60; R. D3)
Rhoiney's motion to reconsider was denied on June 20, 2005. (C. 57, R. E3)

Moving to the merits, the sole allegation set forth in Rhoiney's fourth post-conviction
petition is a claim of actual innocence. The post-conviction Hearing Act contemplates the filing
of only one petition, no more that six months after the completion of the direct appeal. 725 ILCS
5/122-1(a-5), (c) (West 2005); 725 ILCS 122-3 (West 2005); *People v. Pitsonbarger*, 205 Ill. 2d
444, 456 (2002). Moreover, any issues that could have been raised, but were omitted from the
first petition are considered waived. *Id.* However, where petitioner raises a claim of actual
innocence, the waiver rule, as well as the rule regarding the timing of the filing of a post-
conviction petition, are relaxed. 725 ILCS 5/122-1 (c) (West 2005). Furthermore, petitioner's
failure to raise a claim in an earlier petition will be excused if necessary to prevent a fundamental
miscarriage of justice. "To demonstrate such a miscarriage of justice, a petitioner must show
actual innocence." *Pitsonbarger*, 205 Ill. 2d at 459. In Rhoiney's fourth post-conviction petition
alleges that, based on newly discovered evidence, he is actually innocent. (C. 52-53) Actual
innocence is a cognizable constitutional claim. *People v. Washington*, 348 Ill. App. 3d 231, 236-
237 (1st Dist. 2004). A cognizable actual innocence claim is comprised of new, material,
noncumulative evidence which would probably change the result on retrial. *Id.* The basis of
Rhoiney's claim does not meet this standard.

In his petition, Rhoiney alleges that an inmate, Christopher Askew, told Rhoiney that
another inmate, Terrence Sims, overheard a conversation in an elevator between "Dave" and
"Ray" where "Dave" claimed that he never implicated Angelo in Edward's murder and admitted
lying about Rhoiney's involvement in Edward's murder because otherwise he would have been

7

No. 1-05-2489

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County, Illinois. |
| Respondent-Appellee, | ) | |
| | ) | |
| -vs- | ) | No. 88 CR 6091 (02). |
| | ) | |
| EUGENE RHOINEY, | ) | Honorable |
| | ) | James M. Schreier, |
| Petitioner-Appellant. | ) | Judge Presiding. |

**ORDER**

This matter coming to be heard on motion of the Office of the State Appellate Defender, all parties having been duly notified, and the Court being advised in the premises,

IT IS HEREBY ORDERED:

That Appellant's motion to withdraw as counsel pursuant to *Pennsylvania v. Finley* is taken with the case.

_____
PRESIDING JUSTICE

_____
JUSTICE

_____
JUSTICE

DATE: _____

MARIA A. HARRIGAN
Assistant Appellate Defender
Office of the State Appellate Defender
203 North LaSalle Street - 24th Floor
Chicago, Illinois 60601
(312) 814-5472
COUNSEL FOR PETITIONER-APPELLANT

9

IN THE
UNITED States District Court
Northern District of Illinois

Eugene Rhoiney A-15243        )
_____
Plaintiff,                   )
                             )  Case No. 08 CV 4261
        v.                   )
                             )
Mc CANN                      )
_____
Defendant

## PROOF/CERTIFICATE OF SERVICE

TO: M.F. Kennelly Hon.            TO: _____
Magistrate Judge                      _____
219 N. Dearborn                       _____
Chicago Illinois 60101                _____

PLEASE TAKE NOTICE that on August 14th , 2008, I have placed the
documents listed below in the institutional mail at STATEVILLE Correctional Center,
properly addressed to the parties listed above for mailing through the United States Postal
Service: A letter in Respones to Court ORDER of July 31st 2008
with 2 seperate documents, 1-post conviction petition/1 one
MOTION from Illinois STATE APPELLATE Defender lawyer to With Draw/Finley
MOTION

Pursuant to 28 USC 1746, 18 USC 1621 or 735 ILCS 5/109, I declare, under penalty of
perjury, that I am a named party in the above action, that I have read the above
documents, and that the information contained therein is true and correct to the best of my
knowledge.

DATE: Aug 14th 2008            /s/ Eugene Rhoiney
                                NAME: EUGENE RhoiNEY
                                IDOC#: A-15243
                                STATEVILLE Correctional Center
                                P.O. BOX 112
                                Joliet , IL 60434

Revised Jan 2002